# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOU SENG SEE, | Case No. 1:23-cv-01354-KES-BAM (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| RIVAS, *et al.*, | (ECF No. 67) |
| Defendants. | **FOURTEEN (14) DAY DEADLINE** |

## I.      Introduction

Plaintiff Mou Seng See ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.  This action proceeds against Defendants A. Rivas, P. Roman, R. Rivera, and M. Perez-Dorado (collectively "Defendants') for deliberate indifference to the need for medical care in violation of the Eighth Amendment.

On June 6, 2025, Defendants filed a motion for summary judgment on the grounds that: (1) there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law; and (2) Defendants are entitled to qualified immunity.  (ECF No. 67.)[1]  Fed. R. Civ. P. 56.  Plaintiff filed an opposition to the motion for summary judgment on June 30, 2025.

---

[1] Concurrent with this motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. *See Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411–12 (9th Cir. 1988). (ECF No. 67-2.)

(ECF No. 69.)  Defendants filed a reply on July 14, 2025.  (ECF No. 70.)  Plaintiff filed a surreply to Defendants' reply on August 4, 2025.  (ECF No. 74.)  Defendants' motion for summary judgment is fully briefed.  Local Rule 230(l).

For the reasons set forth below, the Court will recommend that Defendants' motion for summary judgment be granted.

**II.    Allegations in Operative First Amended Complaint**

As noted, Plaintiff brings this action against Defendants Rivas, Rivera, Roman, and Perez-Dorado for deliberate indifference to the need for medical care in violation of the Eighth Amendment.

Defendant Rivera

Plaintiff alleges: On 7/24/23, he was found by Defendant Rivera.  Defendant Rivera found Plaintiff unconscious, unresponsive, with bruising, swelling on Plaintiff's face and unable to walk on Plaintiff's own.  Plaintiff was seriously injured and in need of immediate medical aid.  Officer Rivera failed to initiate his alarm for assistance and "medical personal officer knew that he should of waited for medical personal because if he moves me not knowing it will do further damage then the injuries I have already suffered."  (ECF No. 11 at 5 (unedited text).)  He did not care for Plaintiff's well-being.  Health officer woke Plaintiff up and picked Plaintiff up and escorted Plaintiff to another officer for assistance.  Officer R. Rivera knows his actions can result in Plaintiff sustaining more injuries but he didn't care.  Plaintiff believes the officer made this decision because he knew that Plaintiff filed several lawsuits against the department.  He knew the decision that he made can result in Plaintiff losing Plaintiff's memories or life, which will result in Plaintiff's suits being dismissed, or Plaintiff being unable to file further lawsuits.

Officer Rivera knows that every day after workers are done feeding the inmate population they clean their work stations.  Officers are aware that inmates have slipped in the past due to wet floors.  Officer Rivera never took the time to address the situation and to use wet floor signs even though he knows that it will result in someone being seriously injured or die, or being subject to assault because of slipping on wet floor, "like in my case."  (ECF No. 11 at 6.)

///

Defendant Perez-Dorado

Plaintiff alleges: On 7/24/23, Officer R. Rivera escorted Plaintiff to the front of E- dining and passed Plaintiff off to Officer M. Dorado.  The officer saw that Plaintiff was unable to walk on his own and had bruising around one of his eyes and cuts.  The clear visual signs indicated that Plaintiff was injured, but Plaintiff does not remember as he was unconscious.  Instead of calling for immediate medical assistance, Officer Dorado handcuffed Plaintiff, searched Plaintiff, took Plaintiff to the E-yard gym, and put Plaintiff in a holding cage.  Officer Dorado left Plaintiff there to suffer or die.  The officer knew that Plaintiff was injured and if he moved Plaintiff again, it could cause further injuries. He did not care about Plaintiff's wellbeing, health, life.  Plaintiff feels Officer Dorado made this decision because he knew that Plaintiff had multiple lawsuits against the department and knew his action could result in further injuries and damages to Plaintiff.

Defendant Nurse Roman

Plaintiff alleges: On 7/24/23, Plaintiff was in the E-yard gym. He only knows how he got there by officer reports. Plaintiff was unconscious and does not remember RN P. Roman ever conducting a medical evaluation. Defendant Roman said that Plaintiff was in the holding cage, claimed that Plaintiff refused medical care, and that if Plaintiff wanted medical care he needed to put in a 7362 Request to be seen. Plaintiff feels RN Roman is lying because he does not remember RN Roman ever asking him any questions and he does not remember even seeing her in the gym. RN Roman knew Plaintiff was injured because in her report she states "Abrasian, Scratches, Bruises, Discolored area Swollen area and Redness area Front right and left face and neck area." (ECF No. 11 at 8.) She also stated at the chapel that she saw the video of what had happened to Plaintiff, proving that Plaintiff was in need of medical aid the whole time. Defendant Roman left Plaintiff in the E-gym holding cage to suffer and die. She saw Plaintiff's back head hitting the wall, Plaintiff getting kicked in the head with a boot, and Plaintiff unconscious for who knows how long. She knew the longer she waits to provide medical attention can and will result in further damage, injuries, even death, but she chose to ignore her training. Plaintiff believes Roman knew that he filed several lawsuits against the department and knew that her decision

3

could result in Plaintiff not being able to file future complaints and his cases being dismissed because of her decision not to provide medical aid.

Defendant Rivas

Plaintiff alleges: On 7/24/23, Sgt. A. Rivas was informed by Officer Rivera that Plaintiff was involved in an altercation and was discovered having injuries. Sgt. Rivas stated he reviewed the video footage of the altercation, proving that Sgt. Rivas was aware that the back of Plaintiff's head hit the wall, he was knocked out, was on the floor, and was kicked in the head with a boot. Sgt. Rivas failed to notify medical personnel, and failed to call in that he saw the video and that Plaintiff needed immediate medical attention because Plaintiff was seriously injured. Sgt. Rivas came to the E-gym, and at that time could have told the nurses that he saw the video and that Plaintiff needed to be treated immediately, but he did nothing. Instead, Sgt. Rivas came to mock Plaintiff, saying Plaintiff was fighting. Sgt. Rivas made a hand gesture that can only be seen by watching the video footage. Sgt. Rivas' actions prove that he did not care for Plaintiff's life, wellbeing, or health. Sgt. Rivas's failure to notify medical personnel resulted in Plaintiff having complications. Sgt. Rivas knew his inaction could result in further injuries, even death, but chose to do nothing because Plaintiff filed a complaint on him for lying on a legal document, and because Plaintiff filed a complaint against him and is filing several lawsuits against the department. Sgt. Rivas knew that Plaintiff's injuries could result in Plaintiff not being able to continue with his lawsuit if he died from his injuries, which would benefit Sgt. Rivas and the department.

III.   **Defendants' Motion for Summary Judgment**

A. **Legal Standard**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

4

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

5

*aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### B.  Discussion

#### 1.  Plaintiff's Surreply

Plaintiff filed a surreply in response to Defendants' reply to his opposition to summary judgment.  (ECF No. 74.)  Defendants did not object to the surreply or file a motion to strike.

Generally, parties do not have the right to file surreplies, and motions are deemed submitted when the time to reply has expired.  Local Rule 230(l).  However, district courts have the discretion to either permit or preclude a surreply.  *See U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply"); *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file sur-reply where it did not consider new evidence in reply); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond).  In this Circuit, courts are required to afford pro se litigants additional leniency.  *E.g.*, *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

Here, Plaintiff did not seek leave of Court before filing his surreply, nor did the Court request that one be filed.  However, in light of Defendants' apparent non-opposition and Plaintiff's *pro se* status, the Court will exercise its discretion to permit the surreply.  The Court has considered the surreply in reaching its determination.

#### 2.  Video Evidence

On June 6, 2025, in conjunction with their motion for summary judgment, Defendants

moved to file videos submitted in support of the motion for summary judgment under seal. (ECF No. 66.) The Court granted the motion, finding that public disclosure of the videos could threaten the safety and security of CDCR institutions, staff, or inmates. The Court also found that Plaintiff would not be prejudiced by the Court's sealing order given Plaintiff's prior viewing of the videos during discovery, and defense counsel's ability to facilitate Plaintiff's further viewing of the videos upon Plaintiff's request. (ECF No. 71.) Both parties rely on the videos to support their arguments.[2]

The existence of the videos does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in Plaintiff's favor. *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n. 1 (9th Cir. 2007). However, if the video "blatantly contradict[s]" a party's account, "so that no reasonable jury could believe it," the court need not credit the contradicted version on summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) (The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor.); *see Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to the nonmovants . . . so long as their version of the facts is not blatantly contradicted by the video evidence."). The Court will consider the videos and will consider the facts in the light most favorable to Plaintiff.

### 3. Undisputed Material Facts ("UMF")[3]

1. On July 24, 2023, Inmate See was in a physical altercation in the Substance Abuse and

---

[2] While the videos are filed under seal, the Court does not deem the video evidence described in this Order to be of a confidential nature or that which could jeopardize institutional security.

[3] *See* Defendants' Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, (ECF No. 67-1), and Plaintiff's Statement of Facts, (ECF No. 69 at 6-7.) However, Plaintiff did not comply with Local Rule 260(b), which requires any party opposing a motion for summary judgment to reproduce the facts in the moving party's statement of undisputed facts, and admit those facts that are undisputed, deny those that are disputed, and provide a citation to the evidence relied upon in support of the dispute. As a result, Defendants' statement of undisputed facts in support of their motion is accepted except where brought into genuine material dispute by Plaintiff's declaration or papers signed under penalty of perjury. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). Unless otherwise indicated, disputed and immaterial facts are omitted from this statement.

Treatment Facility ("SATF") E-Facility kitchen bathroom.  (ECF No. 67-3, Rivas Decl. at ¶¶ 5, 6).

2. Security camera footage shows that Inmates Debose and See were engaged in a verbal argument.  Both inmates entered the restroom where they can be partially seen fighting.  (*Id.* ¶ 6; ECF No. 67-5, Barba Decl. at ¶ 3 and Ex. A [E-Facility kitchen footage].)

3. Dining Officer R. Rivera was informed by an inmate that he heard commotion toward the inmate restroom in the E-Facility kitchen.  (ECF No. 67-4, Rivera Decl. ¶ 4.)

4. Upon arrival, Officer Rivera noticed Inmate Debose with injuries consistent with a fight on his left cheek.  Officer Rivera used his institutional radio to alert staff of an incident and requested additional officers present.  (*Id.* ¶ 5; Barba Decl. ¶ 5 and Ex. B [Officer Rivera's Body Worn Camera ("Rivera BWC") Footage at 08:39:14 A.M.].)

5. Officer Rivera placed Inmate Debose in handcuffs and escorted him out of the E-Facility Dining Hall.  Rivera then relinquished custody and returned to the kitchen to investigate further.  (Rivera Decl. ¶¶ 5, 6; Rivera BWC at 8:30:40 A.M.)

6. In the inmate restroom, Officer Rivera discovered Inmate See sitting atop the toilet with what appeared to be a bag of ice on his face.  Mr. See appeared to have bruising and swelling on his face.  (Rivera Decl. ¶ 6, 7; Rivera BWC at 8:42:00-07 A.M.)

7. Although he had bruises, Inmate See was conscious and responsive.  (Rivera Decl. ¶ 7; Rivera BWC)

8. Inmate See can be seen getting up and walking on his own without assistance.  (Rivera BWC at 08:42:07-15 AM.)

9. Rivera asked if Inmate See needed medical assistance and See declined.  (Rivera Decl. ¶ 9.; Rivera BWC at 08:42:36-40 A.M.)

10. Officer Perez-Dorado, responding to Officer Rivera's request, arrived at the E-Facility Dining Hall to assist escorting Inmate See to the E-Facility gymnasium holding cell.  (ECF No. 67-9, Perez-Dorado Decl. ¶ 7; Barba Decl. ¶ 5, Ex. C, [Officer Perez-Dorado's BWC footage ("Perez-Dorado BWC") at 8:43:55 A.M.].)

11. Officer Perez-Dorado handcuffed Inmate See and conducted a clothed body search. (Perez-Dorado Decl. ¶ 8; Perez-Dorado BWC at 08:45:00 A.M.)

12. Inmate See was escorted to the holding cell and secured for Rivera to perform an unclothed body search. Inmate See was responsive and compliant. (Rivera Decl. ¶ 9; Rivera BWC at 08:46:32 A.M.)

13. After the search is completed (to negative results), Officer Rivera concluded his involvement. (Rivera BWC Footage at 08:48:11 AM.)

14. Officer Rivera did not witness Inmate See needing or requesting medical assistance at any point during their interaction. Inmate See appeared responsive, coherent, and conscious during all of Rivera's interactions with him. (Rivera Decl. ¶ 10; *see also* Rivera BWC.)

15. Officer Rivera was not present, and did not witness, the physical altercation involving Inmate See. (*Id.* ¶ 12.)

16. Perez-Dorado initiated the holding cell log for Inmate See while he was pending medical evaluation and further investigation into the matter. (Perez-Dorado Decl. ¶ 10.)

17. Once inmates are placed in holding cells, officers are required to maintain a log documenting regular check-ins with the inmate. (*Id.*)

18. Holding cells are utilized to keep inmates involved with an incident separate and safe while medical evaluation or investigations are pending. (*Id.* ¶¶ 9-10.)

19. Officer Perez-Dorado returned to complete the log several times over the next hour. (*Id.* ¶ 10; Perez-Dorado BWC at 09:02:30 A.M., 09:21:00 A.M., 09:33:58 A.M., 09:51:10 A.M.)

20. To the best of Officer Perez-Dorado's knowledge, Inmate See did not appear to be in any distress requiring medical intervention during her interactions with him. (Perez-Dorado ¶ 7.)

21. Licensed Vocational Nurse ("LVN") Roman conducted a medical evaluation and completed a 7219 medical report of Inmate See at approximately 9:06 A.M. (ECF No.

67-7, Roman Decl. ¶ 7; ECF No. 67-8, Ex. A (7219) to Roman Decl.)

22. A 7219 medical report is a head-to-toe assessment of any injuries that medical staff complete to assist custody staff.  Staff also discuss these injuries with the inmates as part of the evaluation.  These evaluations are conducted as soon as actionable after medical staff is notified of the incident.  (Roman Decl. ¶¶ 5, 6.)

23. Nurse Roman documented that Inmate See had abrasions, bruises, reddening, and swelling on his face.  (*Id.* ¶ 7; Ex. A, 7219)

24. Inmate See declined to inform Nurse Roman as to the circumstances resulting in his injuries.  (*Id.* ¶ 8; Ex. A, 7219.)

25. Nurse Roman asked Inmate See if he would like to see a registered nurse for further medical treatment.  Inmate See declined.  Nurse Roman documented this interaction in her report.  (*Id*. ¶ 8, Ex. A, 7219.)

26. Nurse Roman advised Inmate See that, if he changed his mind, he can later submit a medical service request for further treatment.  Nurse Roman documented this advisement in her report.  (*Id.*)

27. Throughout his evaluation with Nurse Roman, Inmate See was alert, coherent, and responsive to her questions.  (*Id.* ¶ 9.)

28. After being informed by Officer Rivera that there had been an undetected fight in the E-Facility kitchen, Sgt. Rivas reviewed the security footage of the incident.  (ECF No. 67-3, Rivas Decl. ¶¶ 5 -6.)

29. By the time Rivas reviewed the footage, there existed no immediate threat to the safety and security of the facility, and the incident did not occur in his area, hence there would be no cause to activate an alarm.  (*Id.* ¶ 8.)

30. While investigating the matter, Sgt. Rivas spoke with Inmate See in the holding cell. Inmate See did not appear willing to admit there was a physical altercation, instead stating he slipped on the floor, at which point Sgt. Rivas informed him that he (Rivas) had already reviewed the footage showing the fight.  (*Id.* ¶¶ 10, 11; Barba Decl. ¶ 6, Ex. D [Sgt. Rivas' BWC footage ("Rivas BWC") at 10:09:16 AM].)

31. Sgt. Rivas removed Inmate See from the holding cell and thereafter retrieved an ice pack for him with assistance from Nurse Roman. (*Id.* ¶ 12; Rivas BWC at 10:13:43-10:16-00 AM.)

32. At all times with Sgt. Rivas, Inmate See was conscious and coherent. Inmate See stood and walked on his own and remained communicative. (Rivas Decl. ¶ 16; Rivas BWC at 10:14:10 AM.)

33. After being released from the holding cell, Inmate See spent about thirty to forty minutes out on the yard. (*See* ECF No. 68, Plaintiff's Depo Tr. at 44:24-45:1.)

34. Officer Perez-Dorado's body worn camera shows that she passed Inmate See at 10:41 A.M., where he again appears conscious, communicative, and standing on his own, applying an ice pack. (Perez-Dorado BWC at 10:41:32 A.M.)

35. A nonparty lieutenant informed Inmate See he would be taken to a hospital for further treatment. (See Plaintiff's Depo Tr. at 45:2-10.)

36. Inmate See recalled doctors informing him he experienced a fracture of an eye socket, but did not recall which eye or if there were any other injuries. (*Id.* at 45:11-25.)

37. All custody staff are equipped with an institutional radio to communicate with staff or to call for assistance. (Rivas Decl. ¶ 3.)

38. Certain custody positions, including dining hall officers, are equipped with an additional personal alarm device that can be activated when officers witness an incident threatening the safety or security of the institution or in circumstances where there is an immediate medical emergency. (*Id.*)

39. Officers are also able to raise relevant alarms through their institutional radio, by voice, or even whistle. (*Id.*)

40. Examples of situations where an officer might activate a personal alarm device include active incidents like inmate fights, attacks on staff, inmates experiencing chest pains, loss of consciousness, and other medical necessities. (Rivera Decl. ¶ 3; Perez-Dorado Decl. ¶ 4.)

41. It is not common practice to raise an alarm after an incident has concluded. (Rivera

11

Decl. ¶ 3; Perez-Dorado Decl. ¶ 4.)

## 4. Parties' Positions

Defendants contend that there is no evidence that any of the defendants had any awareness Plaintiff was experiencing a serious medical need. Defendants further contend that there is incontrovertible video evidence showing Plaintiff's version of events is implausible. To that end, Defendants argue that contrary to Plaintiff's story, body worn camera footage shows that he was not only conscious throughout each interaction with the Defendants, but also that he was alert, responsive, and coherent enough to converse with responding staff, which he did when he declined medical treatment from Defendants. Defendants state that it is apparent from the video evidence that responding officers and medical staff witnessed a lucid Plaintiff, and thus, could not have drawn the conclusion that he was experiencing a medical emergency. Defendants argue that Plaintiff cannot create a genuine factual dispute as to essential elements of his deliberate indifference claim against Defendants and he cannot provide any evidence suggesting Defendants had the requisite subjective awareness to be deliberately indifferent. Additionally, Defendants argue that they are entitled to qualified immunity, as there is no clearly established law requiring that they activate an alarm for emergency medical staff after an incident has concluded and when the involved inmate is alert and well enough to decline assistance.

In opposition, Plaintiff argues that there is evidence that all defendants had knowledge of his injuries and failed to notify medical to attend to his injuries. Plaintiff claims that on July 24, 2023, he was involved in an incident in the kitchen, where he was knocked out and was unconscious for several hours. Plaintiff claims he has no memories of what happened from when he got knocked out to when he woke up several hours later to be released to go back to his cell. Plaintiff contends he was released from the E-yard gym and was surprised how he got there. Someone gave him an ice pack and told him that it was okay to go back to his cell. Plaintiff was mad because he did not receive any medical aid. He walked back to his cell, was about to shower when the pain he was feeling started to hurt and became serious where he was not able to function. Plaintiff walked back to medical in pain and was mad that none of the CDCR staff helped him, and that they left him in the holding cage for two hours. They kept telling him that

12

he refused medical aid.  Plaintiff was transported to the prison clinic two hours later and was transported to Bakersfield Hospital, where he found that he sustained an orbital fracture.

Plaintiff additionally asserts that Defendants are not entitled to qualified immunity because each defendant knew that he was seriously injured and in need of immediate medical attention the moment they encountered him.  Plaintiff further asserts that even after Defendants saw the video footage of the incident, they took no action and instead left him in the holding cage "to suffer and die." (ECF No. 69 at 18.)  He argues that Defendants knew he was seriously injured and was knocked unconscious in need of immediate medical attention, "during contact with [Plaintiff] and after the defendant watched what really happened to [him]." (*Id.* at 19.) Instead of helping Plaintiff, they left him "in the holding cage to suffer and die, and making claims that [he] refused medical treatment when [he has] no memory of the after event" until he was given the Rules Violation Report and saw the video. (*Id.*)  He claims Defendants left him in the holding cage for about 2 hours without medical attention and he had to come back on his own free will to get medical treatment because Defendants refused to provide any treatment.

In reply, Defendants assert that Plaintiff fails to present any evidence to demonstrate that Defendants disregarded any serious medical need.  Defendants further assert that Plaintiff's opposition fails to show any genuine dispute of material fact.  They contend that Plaintiff repeats his claims of deliberate indifference with no evidentiary support, "flying in the face of incontrovertible video evidence showing that his claims lack merit." (ECF No. 70 at 1.) Defendants additionally argue that even if Plaintiff was able to create a genuine dispute of facts, he "does not identify any case law showing that Defendants' alleged misconduct – i.e. that Defendants failed to activate an alarm after discovering him—would violate any 'clearly established' right" and that qualified immunity bars Plaintiff's claims. (*Id.*)

In his surreply, Plaintiff argues that Defendants are not entitled to qualified immunity because the evidence presented by Defendants "proves that all defendant was aware of the injurys and how I sustained the injuries, and took no action to alert Medial Personal to attend to my injury's to stop further injuries." (ECF No. 74 at 1 (unedited text).)  Plaintiff claims that even with the knowledge of what took place, Defendants knew the seriousness of the injuries he

13

sustained according to body worn camera footage and their declarations, and left him in the holding cage to suffer.  Plaintiff contends that as the result of Defendants' inaction, medical treatment was delayed for about 2 hours in violation of the Eighth Amendment.  Plaintiff argues that Defendants' claim that he denied medical treatment is false because he has no memories of how he got to the holding cage in the gym from the kitchen bathroom.

### 5. Analysis

#### a. Eighth Amendment – Deliberate Indifference

A prisoner's claim of inadequate medical care constitutes cruel and unusual punishment in violation of the Eighth Amendment where the mistreatment rises to the level of "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  The two-part test for deliberate indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096.

A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Deliberate indifference is a high legal standard," *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. *Jett*, 439 F.3d at 1096.  In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–06).  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

The parties do not dispute that Plaintiff was involved in a physical altercation with another inmate on July 24, 2023, in the E-Facility kitchen bathroom.  UMF 1; *see*, *e.g.,* ECF 69 at 6, 8,

14

11. Rather, they dispute whether Defendants were deliberately indifferent to a serious medical need following that altercation. Despite Plaintiff's arguments to the contrary, the undisputed video and documentary evidence shows that Plaintiff was conscious throughout each interaction with Defendants, that he was alert, responsive, and coherent enough to converse with responding staff, and that he repeatedly declined medical treatment. UMF 7-9, 10-12, 14, 19-20, 25-27, 32. Plaintiff has not presented evidence to raise a genuine dispute that any defendant disregarded a serious medical need in violation of the Eighth Amendment or that he was experiencing a medical emergency justifying the activation of an alarm.

Defendant Rivera

Based on the undisputed evidence, Defendant Rivera was not deliberately indifferent to a medical need when he responded after the altercation and placed Plaintiff in the holding cell. By the time Defendant Rivera discovered Plaintiff, the altercation had concluded, and there was no need to activate an alarm. UMF 15, 40-41. When Officer Rivera discovered him, Plaintiff was in the inmate restroom sitting atop the toilet. UMF 6. Plaintiff was conscious and responsive and can be seen on the video footage standing up and walking on his own. UMF 7-8 (Rivera BWC 08:42:00-15 AM). As Defendant Rivera and Plaintiff walked out of the dining hall together, Defendant Rivera asked if Plaintiff needed medical assistance, which Plaintiff declined. UMF 9 (Rivera BWC 08:42:36-40 AM). Once they exited the dining hall, Defendant Perez-Dorado assisted with escorting Plaintiff to the holding cage in the gym, where Defendant Rivera conducted an unclothed body search. UMF 10-12 (Rivera BWC). According to the video footage, Plaintiff was able-bodied, responsive, coherent, and conscious during all of Defendant Rivera's interactions with him, and Plaintiff declined medical treatment. UMF 8, 14 (Rivera BWC). There is no evidence from which to conclude that Plaintiff was experiencing a medical emergency requiring Defendant Rivera to activate his alarm or to summon immediate medical treatment.

In his opposition, Plaintiff claims that Defendant Rivera found him injured and unconscious with bruising and swelling on his face and that Defendant Rivera knew if he moved Plaintiff, it could cause him further injuries. (ECF No. 69 at 10.) Plaintiff indicates that

15

according to the CDCR California Correctional Department Operation Manual, an individual who encounters a medical emergency is responsible for summoning assistance by the most expeditious means available and in the event of serious illness or injury, employees shall request assistance from first aid personnel, and not move the victim unless absolutely necessary.  (ECF No. 69 at 10.)  Plaintiff claims that Defendant Rivera knew that an altercation had occurred and that both inmates were injured, but did not initiate his institution alarm according to CDCR policy.  (*Id.* at 10-11.)  Plaintiff argues that because Defendant Rivera chose to ignore his training, Plaintiff was left in the holding cage for 2 hours to suffer and die.  (*Id*. at 11.)  Plaintiff asserts that while Defendant Rivera stated that Plaintiff was lucid, responsive, Plaintiff has no memories of the events, which "clearly states the severity of the injuries" he sustained and "is the purpose for the immediate medical aid."  (*Id.*)  Plaintiff also declares that at no time did Defendant Rivera ask Plaintiff if he needed medical assistance and he did not decline medical aid.  (ECF No. 69 at 8, I.)

Plaintiff's assertions regarding his contact with Defendant Rivera are contradicted by the video footage, which demonstrates not only that Defendant Rivera did not witness the altercation, but also that at all times during his interactions with Defendant Rivera, Plaintiff was conscious, responsive, coherent, able to stand and walk on his own, and that Plaintiff declined medical treatment when asked.  UMF 6-9, 14, 15 (*see also* Rivera BWC).  Plaintiff's account that he was unconscious when found by Defendant Rivera, such that there was a medical emergency necessitating the activation of Defendant Rivera's alarm, is contradicted by the video evidence.  That Plaintiff claims to have no memory of events does not raise a genuine dispute of material fact.  Plaintiff fails to offer any evidence from which a reasonable jury could conclude that Defendant Rivera knew of and failed to respond to a serious medical need.

Defendant Perez-Dorado

Based on the undisputed evidence, Defendant Perez-Dorado was not deliberately indifferent to a medical need.  According to the video footage, Defendant Perez-Dorado first encountered Plaintiff outside the E-Facility dining hall.  UMF 10.  Plaintiff can be seen standing on his own without assistance.  Defendant Perez-Dorado handcuffed Plaintiff and conducted a clothed body search.  UMF 11.  She then escorted Plaintiff to the E-Facility gym holding cell, and

16

she initiated the holding cell log.  UMF 12, 16.  According to the uncontradicted video evidence from Defendants Rivera and Perez-Dorado, Plaintiff was conscious, responsive and compliant with orders, able to walk and stand, and able to be searched.  *See* UMF 6-8, 11-12, 14, 19-20, 34.

After initiating the holding cell log, the video footage shows that Defendant Perez-Dorado returned to check on Plaintiff in approximately fifteen-to-twenty-minute intervals while he remained in the holding cell. UMF 19.  The footage also shows that she walked past Plaintiff on multiple occasions and that each time she returned to check on him and to complete the log, she asked Plaintiff if he was good.  Plaintiff was responsive to Defendant Perez-Dorado's questions and did not indicate that he needed medical aid.  (*See* Perez-Dorado BWC at 09:02:30-50 A.M., 09:20:50-09:21:31 A.M., 09:33:58-09:34:33 A.M., 09:51:07-35 A.M.)  Further, the video evidence shows that during one of her checks, Defendant Perez-Dorado asked Plaintiff if medical had seen him, and Plaintiff confirmed that medical had come already.[4]  (*See* Perez-Dorado BWC at 09:21:50-09:21:30 A.M.)  Per the footage, there is no evidence from which a reasonable jury could conclude that Defendant Perez-Dorado knew of and was deliberately indifferent to a serious medical need or that Plaintiff was experiencing a medical emergency requiring an alarm or immediate intervention.

In his opposition, Plaintiff claims that Defendant Perez-Dorado is equally guilty of being deliberately indifferent because her report states that the moment she saw Plaintiff, she could clearly see bruising around one of Plaintiff's eyes and cuts. (ECF No. 69 at 11-12.)  Plaintiff asserts that according to the body worn camera footage of Defendants Rivera and Perez-Dorado, he was having trouble walking on his own and was in need of staff assistance.  (ECF No. 69 at 12.)  Plaintiff argues that Defendant Perez-Dorado knew that Plaintiff "was clearly hurt, and unable to stand without staff assistance, and instead of helping [him] and notifying medical personel [sic] she took [him] to the gym holding cell and left [him] there to suffer and die." (*Id.*)  Plaintiff contends the body worn camera footage clearly shows that when she conducted her holding cell checks, Defendant Perez-Dorado did not go over to the holding cage to check to see

---

[4] This is consistent with Defendant Roman's 7219 medical report indicating Plaintiff was evaluated at approximately 9:06 A.M.  UMF 21.

if Plaintiff was alive, breathing, in pain, or suffering. Plaintiff contends that the moment Defendant Perez-Dorado saw the injuries on his face, she should have notified medical personnel. (*Id.*) He declares that at no time did Defendant Perez-Dorado ask him if he needed any medical aid. (ECF No. 69 at 9, IIII.) Plaintiff also claims that Defendant Rivas' body worn camera footage clearly shows that Defendant Perez-Dorado saw the video of where Plaintiff was kicked in the face and knocked unconscious for several minutes, but still did nothing. (*Id.* at 12-13.)

As discussed above, Plaintiff's claims that he was unable to walk or stand without staff assistance, was left to suffer and die, and that Defendant Perez-Dorado never checked to see if he was alive or ask if he needed aid are directly contradicted by the video evidence. Even if Defendant Perez-Dorado later viewed footage of the incident, she was not present during the altercation and Plaintiff was conscious, responsive, and compliant with orders during her interactions with him. *See* UMF 10 ("Officer Perez-Dorado, responding to Officer Rivera's request, arrived at the E-Facility Dining Hall to assist escorting Inmate See to the E-Facility gymnasium holding cell."); UMF 11-12, 19 (Perez-Dorado BWC). Plaintiff fails to offer any evidence from which a reasonable jury could conclude that Defendant Perez-Dorado knew of and failed to respond to a serious medical need.

Defendant Roman

According to the video evidence, Plaintiff confirmed he had been seen by medical staff while in the holding cell prior to 9:20 A.M. (*See* Perez-Dorado BWC at 09:21:50-09:21:30 A.M.) The documentary evidence and declaration of Defendant Roman reflect that she conducted a medical evaluation and completed a 7219 medical report of Plaintiff at approximately 9:06 A.M., documenting that he had abrasions, bruises, reddening, and swelling on his face. UMF 21, 23. During the evaluation, Plaintiff declined to inform Defendant Roman as to the circumstances resulting in his injuries. UMF 24. Plaintiff also declined further medical treatment, and Defendant Roman advised him that if he changed his mind, he could later submit a medical service request for further treatment. UMF 25. Throughout the evaluation with Defendant Roman, Plaintiff was alert, coherent, and responsive to her questions. UMF 27. Based on this evidence, a reasonable jury could not conclude that Defendant Roman knew of and was

18

deliberately indifferent to a serious medical need, and Plaintiff fails to raise a genuine dispute of material fact.

In his opposition, Plaintiff states his feeling that Defendant Ramon "conducted her evaluation when [he] was unconscious," which is why he has no memory of the event. (ECF No. 69 at 13.) He also declares under penalty of perjury that at no time did Defendant Roman conduct her medical evaluation, and at no time did he refuse medical care. (ECF No. 69 at 8, II.) Plaintiff argues that Defendant Roman, being a medical professional, should have known that Plaintiff was in need of medical assistance because she saw the video before she conducted her evaluation, knew he was in an altercation and knocked to the ground where he was knocked unconscious for several minutes, and that he was unconscious when she conducted her medical evaluation and Plaintiff was unable to answer her question. (ECF No. 69 at 13-14.) Plaintiff claims that for Defendant Roman to write on her report that he refused medical treatment when he was unable to because he was unconscious shows her true intentions. Plaintiff further claims that the holding cell log does not state the time she conducted the evaluation nor is the evaluation shown on Defendant Perez-Dorado's body camera footage, which proves that Defendant Roman never conducted it. (*Id.* at 14.)

Plaintiff's arguments that he was unconscious during Defendant Roman's evaluation or, alternatively, that Defendant Roman never completed the evaluation, are contradicted by video evidence from Defendant Perez-Dorado's body worn camera footage in which Plaintiff appeared responsive and conscious while in the holding cell and during which he confirmed he had been seen by medical. That Plaintiff now claims to have been unconscious during the evaluation and unable to decline treatment is belied by his own confirmation on the video footage that he was seen by medical. Plaintiff could not have confirmed that he had been seen by medical if he had been unconscious during the encounter. That Plaintiff also claims to have no memory of the event also is not sufficient to raise a genuine dispute of material fact. Further, even if Defendant Roman viewed footage of the incident prior to the evaluation, she was not present during the altercation and Plaintiff was alert, responsive, and declined further treatment during the evaluation. Plaintiff fails to offer any evidence from which a reasonable jury could conclude that

19

Defendant Roman knew of and failed to respond to a serious medical need.

Defendant Rivas

Defendant Rivas was not deliberately indifferent to a medical need when he investigated the altercation and spoke with Plaintiff in the holding cell. Defendant Rivas did not witness the fight in the E-Facility kitchen. UMF 28-29. Defendant Rivas's role was limited to investigating the matter after the incident had concluded. UMF 30. After reviewing the footage of the incident, Defendant Rivas spoke with Plaintiff in the holding cell. Plaintiff was not willing to admit that there was a fight, stating he slipped on the floor. UMF 30. Per the uncontroverted video evidence, when asked by Defendant Rivas, Plaintiff confirmed that he was alright, he had no safety concerns, he was good, and he just wanted ice. (*See* Rivas BWC 10:09:14-10:11:31.) At all times with Defendant Rivas, Plaintiff was conscious, coherent, stood and walked on his own, and remained communicative. UMF 32 (Rivas BWC). Based on the body worn camera footage, there is no evidence from which a reasonable jury could conclude that Defendant Rivas knew of and was deliberately indifferent to a serious medical need or that Plaintiff was experiencing a medical emergency requiring an alarm or immediate intervention.

In his opposition, Plaintiff declares that at no time did Defendant Rivas ask Plaintiff if he wanted medical treatment. Instead, Defendant Rivas came to mock him by pointing to his eyes with two fingers, indicating that he had seen the video footage and was copying what he did before the incident. (ECF No. 69 at 8-9.) Plaintiff further argues that Defendant Rivas knew that Plaintiff was in an undetected fight, according to the incident report and Defendant Rivas' declaration, and that Plaintiff sustained some injuries as a result of the incident. Plaintiff claims that according to reports, Defendant Rivas reviewed security camera footage of the E-yard kitchen facility bathroom and saw that the back of Plaintiff's head hit the wall, he fell to the floor, was kicked in the head with a boot, and was unconscious for several minutes. Plaintiff states that this was before Defendant Rivas came to see him in the gym holding cage. Plaintiff contends that Defendant Rivas knew that Plaintiff was seriously injured, was unconscious for several minutes. Plaintiff further contends that Defendant Rivas knew before he came to see Plaintiff in the gym that Plaintiff was in pain and needed help, but Defendant Rivas did nothing. He did not notify

20

medical of what he saw in the video, and he knew that by not getting treated immediately that Plaintiff would suffer more.  Plaintiff argues that Defendant Rivas' action or inaction proves that his intention was for Plaintiff to suffer further.  Plaintiff states that as a result, he was left in the holding cage for about 2 hours before he was finally sent to the hospital and found out that he received a right orbital floor facture.

Plaintiff fails to present evidence to raise a genuine dispute of material fact that Defendant Rivas knew of serious injury and failed to respond.  Although Defendant Rivas reviewed footage of the altercation, he did not witness it, as his role was limited to investigating the matter after the incident had concluded.  Plaintiff's assertion that Defendant Rivas knew that Plaintiff was injured, in pain, and needed immediate medical treatment simply by viewing footage of the altercation is not supported by the evidence.  Instead, the uncontroverted video evidence reveals that at all times during his interactions with Defendant Rivas, Plaintiff was conscious, coherent, stood and walked on his own, remained communicative, and confirmed that he was alright and good.  Plaintiff fails to offer any evidence from which a reasonable jury could conclude that Defendant Rivas knew of and disregarded an excessive risk to Plaintiff's health or safety.

### b. Qualified Immunity

Defendants additionally argue that they are entitled to qualified immunity because "[t]here is no clearly established law or binding authority that would have informed every reasonable official in any of Defendants' positions that an inmate presenting himself able-bodied, conscious, and responsive while also refusing further medical treatment would require the activation of an alarm for emergency medical assistance." (ECF No. 67 at 14.)  Given the Court's determination that Defendants were not deliberately indifferent to a serious medical need in violation of the Eighth Amendment, it is unnecessary to reach this argument.

### IV.    Conclusion and Recommendation

For the reasons explained above, the Court finds that Defendants Rivera, Roman, Rivas, and Perez-Dorado are entitled to summary judgment.

Accordingly, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment, (ECF No. 67), be GRANTED.

21

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  **Objections, if any, shall not exceed fifteen (15) pages or include exhibits.  Exhibits may be referenced by document and page number if already in the record before the Court.  Any pages filed in excess of the 15-page limit may not be considered.**  The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    **March 31, 2026**                    /s/ *Barbara A. McAuliffe*
                                        UNITED STATES MAGISTRATE JUDGE

22